## PHOSPHATE RECOVERY CORPORATION v. SOUTHERN PHOSPHATE CORPORATION.

### No. 1087.

District Court, D. Delaware.
May 12, 1937.

Hugh M. Morris and Robert H. Richards (of Richards, Layton & Finger), all of Wilmington, Del., and Howard M. Morse and Henry D. Williams (of Williams, Rich & Morse), all of New York City, for plaintiff.

E. Ennalls Berl (of Ward & Gray), all of Wilmington, Del., William H. Davis (of Pennie, Davis, Marvin & Edmonds), and John F. Neary (of Hoguet, Neary & Campbell), all of New York City, and B. G. Foster, of Washington, D. C., for defendant.

NIELDS, District Judge.

This is the usual patent infringement suit. Plaintiff charges defendant with infringement of a patent to George A. Chapman and John W. Littleford, No. 1,968,008, issued July 24, 1934, upon application filed March 26, 1929, for "Concentration of Minerals." Plaintiff's ownership is proved by assignment from the inventors to Minerals Separation North American Corporation and by assignment by that corporation to the plaintiff. The sole defense is invalidity.

### Problem in the Industry.

The principal source in the United States of calcium phosphate used as a raw material by the fertilizer and chemical industries is the so-called Pebble Phosphate Rock Field of Florida. Under an "overburden" of earth and sand varying in depth from 5 to 25 feet lies a stratum or "matrix" of phosphate mineral varying in thickness from 3 to 12 feet. The business of the Florida phosphate industry is to mine this phosphate mineral and to remove from it the silica and clay. "Phosphate concentrates" thereby produced are sold to the fertilizer and chemical industries. The overburden is removed by huge scoops operated by powerful machinery and piled in long ridges. This leaves the stratum of phosphate material exposed. It is then mined hydraulically. This hydraulic mining disintegrates the stratum of phosphate ore by means of powerful streams of water. The mixture of ore and water is pumped to a "washing" plant through an iron pipe a foot in diameter.

The phosphate washing plant separates the silica and clay from the phosphate particles and screens out the coarser phosphate material. Much of the clay is washed out. A large proportion of the phosphate mineral is of such a size as to be easily separated from the gangue by washing and screening. About 50 per cent. of the phosphate is thus removed in the form of a finished product suitable for market.

The remaining 50 per cent. of the phosphate passes through the screens in the washing plant along with the major part of the silica and other impurities. Until about 1927, this finer material, known in the industry as "washer waste," "washer tailings," or "débris," was regarded as unconcentratable and was sent to waste. Such washer waste was allowed to flow away frequently into pits from which phosphate mineral had been mined. The solids settled there. Such "dumps" are scattered over the Florida phosphate field. They contain many millions of tons of phosphate in the form of fine phosphate particles mixed with silica and clay. The loss involved in sending to the dumps 50 per cent. of the phosphate was fully understood. Unsuccessful efforts had been made to solve the problem of saving it.

Since 1927 plaintiff has solved this problem on a commercial scale by two new complementary methods.

One is particularly useful when both the phosphate and the silica particles are comparatively fine. This is the so-called froth flotation process. It is not involved in this case.

The other method of separating phosphate particles from the silica particles in the tailings rejected by a washer plant is described in the Chapman and Littleford patent in suit. This so-called "tabling" method is particularly useful for the treatment of material which contains particles too large to be satisfactorily treated by froth flotation. Of course, it is possible by grinding to reduce the coarse material

to a size capable of being efficiently treated by froth flotation. Such grinding involves expense as well as loss of very fine material and should be avoided, if possible.

### History of Patent in Suit.

The Chapman and Littleford file wrapper and contents and the decision of the Examiner of Interferences, dated January 29, 1932, show that the Patent Office considered no less than 18 patents and 6 publications disclosing the prior art before the patent in suit was granted. The following patents referred to at the trial of this suit were carefully considered by the Patent Office Examiners, who held that they did not negative the patentability of the Chapman and Littleford invention: Sulman, Picard & Ballot, No. 879,985; Cattermole, No. 777,273; (this acid patent is the companion to the Cattermole alkali patent No. 763,260 cited in this case); Sulman & Edser, No. 1,492,904; Broadbridge & Edser, No. 1,547,732; Trotter & Wilkinson, No. 1,795,100; Littleford, No. 1,780,022.

The Chapman and Littleford patent application was submitted not merely to ex parte consideration, but also to inter-partes consideration in the Mason v. Martin v. Chapman and Littleford interference. Mason and Martin found themselves antedated by Chapman and Littleford. They contested the patentability of the Chapman and Littleford invention. It appears in Mason's and Martin's motions to dissolve, and particularly in the decision about to be quoted, that the patentability of what are now claims 1 to 3 and 6 to 8 of the patent in suit was attacked.

The decision of the Examiner of Interferences contains the following passages:

"Broadbridge and Edser in their domestic patent, No. 1,547,732, and in their corresponding British patent, No. 171,155, describe their process as concentration by froth flotation. The domestic patent was cited against Martin during the prosecution of his application, and it is believed he then rightly contended that there is no disclosure therein of the formation of loosely bonded agglomerates and the separation thereof from gangue by agitative wet stratification.

"Without discussing the other reference cited by Martin in detail, and thus unnecessarily lengthening this opinion, it is held that Chapman and Littleford describe a process dissimilar to that disclosed by any reference Martin cites, and that the process of Chapman and Littleford is not anticipated by such references, whether taken singly or in any obvious combination.

"The patents to Elmore, No. 703,905, Cattermole, No. 777,273, and Darling, Nos. 763,859 and 795,823 cited by Martin as showing by comparison with the patents herein-before listed that the processes of Martin, and Chapman and Littleford are entirely different and operate on different principles do not, it is believed, sustain Martin's point. In neither the process disclosed by the party Martin nor that disclosed by the party Chapman and Littleford, with the small quantity of oil used by each party, are shot-like granules, such as described by Cattermole, or a buttery and homogeneous mass, as described by Darling, or oil globules, as described by Elmore, formed. These patented processes are true oil adhesion processes; the processes of Martin, and Chapman and Littleford are not. As Chapman and Littleford state, the oil coatings of the particles composing the loosely bonded agglomerates formed in the practice of theirs and of their opponent's process are ultra-microscopic and have no effect in causing adhesion of one particle to the other.

"The motion of Martin to dissolve will be denied.

"As the basis of his motion to dissolve, Mason maintains that the invention defined in the counts is unpatentable in view of prior art. He refers to a plethora of patents and publications, including patents cited by Martin and above considered. * * *

"In plain and definite terms the counts of this interference define a process whereby phosphate, the mineral treated, is separated from gangue under the surface of water, which is to say a differential sinking process. For example, count 1 recites that the loosely bonded agglomerates of phosphate mineral particles are adapted, when a mixture of said agglomerates and the gangue particles contained in the ore is agitated under wet stratifying conditions, to settle at a less rate than the gangue, then subjecting the mixture to agitative wet stratifying classification according to the relative settling values of said agglomerates and the gangue and gathering the phosphate mineral in an overlying stratum. It follows, therefore, that the references relied upon by Mason do not meet the

terms of the counts, and that the counts are for patentable subject matter. Accordingly, the motion of Mason to dissolve will be denied. * * *

"As with the original counts of this interference, Mason contends that proposed counts A B and C [claims 6, 7 and 8 of the Chapman and Littleford patent in suit] define a flotation process, and that thus interpreted they are anticipated by the prior art he cites. Mason again takes an untenable position, it is believed. Proposed count B [claim 7 of the Chapman and Littleford patent] specifically recites the steps of subjecting pulp to agitative wet stratifying classification according to the relative settling values of the phosphate material and the gangue, and recovering phosphate concentrate in an overlying stratum, and counts A and C [claims 6 and 8 of the Chapman and Littleford patent] in less specific form include the same essential steps. The references cited by Martin and just listed are all directed to flotation processes. They are, of course, equally as impertinent in anticipating counts A, B, and C [claims 6, 7 and 8 of the Chapman and Littleford patent] as any references cited by Mason. No reference cited shows the packing and accumulating of silica recited in proposed count D.

"It is held that proposed counts A to D inclusive are not anticipated in the prior art cited by the parties. The primary examiner reports that they are not anticipated in any references he has uncovered."

The above decision of the Examiner of Interferences was affirmed by the Board of Appeals of the Patent Office. In turn the Board of Appeals of the Patent Office was affirmed by the Court of Customs and Patent Appeals. Martin v. Chapman, 71 F.(2d) 174.

It is significant that neither the Patent Office Examiners, nor the opposing parties, Mason and Martin, ever asserted that the Christensen patent has any bearing upon the patentability of the Chapman and Littleford invention. The inference is justified that they regarded the Christensen process as too far removed from the Chapman and Littleford process to be worthy of consideration.

### Relation of the Parties.

March 26, 1929, the application for the Chapman and Littleford patent in suit was filed. May 9, 1930, the manager and mining superintendent of the defendant visited plaintiff's plant No. 2 at Mulberry, Fla., and there saw the Chapman and Littleford process in operation on tables. The reagents then being used for the treatment of the pulp were caustic soda, oleic acid, and fuel oil. These are the reagents mentioned in the patent in suit. About May 30, 1930, defendant's president had a conference with R. B. Martin, one of the parties in the interference proceeding with Chapman and Littleford. Martin told defendant's president that "he [Martin] could concentrate phosphate rock, by tabling, by using soap and fuel oil." Thus for the second time during May, 1930, defendant was informed respecting the Chapman and Littleford process. In March, 1932, defendant began the use of table concentration, employing the process described in the patent in suit at San Gully, Fla. This first installation was of a single table. October 26, 1933, plaintiff's counsel sent to counsel for defendant a letter and inclosures. These papers gave defendant's counsel full information respecting the subject matter of the pending application for the Chapman and Littleford patent in suit. About February 15, 1934, defendant erected and put into operation near Medulla, Fla., a plant of 21 tables employing the process described in the patent in suit. Since then defendant has continuously employed this process.

March 5, 1934, plaintiff and defendant entered into a license agreement fully recited in the following letter:

"March 5, 1934

"Southern Phosphate Corporation,
"1841 Baltimore Trust Building,
"Baltimore, Maryland.

"Gentlemen:

"We are writing this letter to confirm certain understandings with you with reference to the license agreements with you, Amalgamated Phosphate Company and The American Agricultural Chemical Company which we have executed as of March 5, 1934.

"This letter is made desirable by reason of the fact (so we are informed) that Southern Phosphate Corporation is now, at Medulla, Florida, producing concentrates from phosphorus bearing materials by methods described in a pending application for United States letters patent in the name of George A. Chapman and John W. Littleford, Serial No. 349,923, which letters patent when and if granted will be included

among the letters patent within the aforesaid license.

"It is understood and agreed that no royalties will accrue and that Southern Phosphate Corporation is not obligated to pay any royalties under the aforesaid license, by reason of its use of the methods of the aforesaid Chapman and Littleford patent application, until letters patent resulting therefrom shall issue.

"Nevertheless, it is understood and agreed that Southern Phosphate Corporation, in the manner described in the aforesaid agreement, shall keep proper books of account and deliver to the undersigned, Phosphate Recovery Corporation, monthly accounts covering the use of said methods exactly as if royalties were required to be paid as a result of the use of said methods of the Chapman and Littleford patent application.

"It is further understood and agreed that, in connection with Section 3 (a) of the aforesaid agreement, the royalties which Southern Phosphate Corporation would be required to pay, in the event that said Chapman and Littleford patent had already issued, shall be regarded as having been paid from this day up to the date upon which said Chapman and Littleford patent may issue.

"It is further understood and agreed that the aforesaid plant of Southern Phosphate Corporation shall be regarded as a plant for producing concentrates under the aforesaid license within the meaning of Section 3 (c) of said agreement.

"It is further understood and agreed that in the event that the United States Patent Office finally refuses to grant the said Chapman and Littleford patent, the undersigned shall promptly notify you, Amalgamated Phosphate Company, The American Agricultural Chemical Company and any other exclusive licensee of that fact.

"It is further understood and agreed that nothing stated in this letter shall be considered as a statement or concession of any kind by the undersigned in regard to the validity and/or scope of any other letters patent within the aforesaid license.

"Very truly yours,
"Phosphate Recovery Corporation
"By [Signed] L. C. M. Gibbs
"Vice President.

"We acknowledge receipt of the foregoing letter on this 16th day of March, 1934, and agree that it correctly states our understanding with reference to the matters therein referred to.

"Southern Phosphate Corporation
"By [Signed] Chester A. Fulton
"President."

Defendant practiced the process of the pending application for the Chapman and Littleford patent in suit and rendered to plaintiff monthly reports of the tonnage of concentrates produced by it under the license for the months of February, March, April, May, June, and July, 1934.

June 5, 1934, defendant's president consulted Professor Taggart: "I described minutely the process, as we were using it in Florida, at our plants, and asked him if he thought that tabling was patentable, and if he thought that the process as I described it, was patentable. He told me that he thought we were operating squarely under the Christensen patent, possibly under the Whitaker patent."

June 13, 1934, plaintiff advised defendant of the decision of the Court of Customs and Patent Appeals and that royalties would accrue under the license. Defendant's president testified: "I then engaged Professor Taggart to proceed to Florida and make a minute examination of our process, and let me know immediately if he still thought that we were operating under the Christensen patent. He replied on July 17, 1934, by telephone, and told me that we were operating squarely under the Christensen patent."

Meanwhile on July 10, 1934, defendant grabbed Time by the forelock and purchased the Christensen patent. Following the telephone report by Professor Taggart, defendant gave notice on July 20, 1934, of the surrender of its license. July 22, 1934, defendant shut down its plant. July 24, 1934, the patent in suit issued. A notice thereof was given to defendant August 1, 1934. August 20, 1934, defendant resumed the operation of its 21 table plant by the process of plaintiff's patent and has since operated that plant without license.

### The Invention.

The invention, described and claimed in the Chapman and Littleford patent in suit, resulted from two important discoveries. (1) When a phosphate mineral in a thick pulp is treated with soap, alkali, and fuel oil, there are formed in the pulp loosely-bonded agglomerates of phosphate particles. (2) The other discovery made by

Chapman and Littleford is described on page 1, lines 76–86, of the patent specification: "Many phosphate particles float on the water surface as a skin or film float and are carried off into the concentrates launder 11 by the transversely flowing stream of water. Other phosphate particles, many of them in flocks associated with air bubbles, form aggregates or loosely bonded agglomerates and, in suspension in the water, or resting lightly on the silica or other impurities are carried transversely, separating themselves from the endwise movement of the other particles by the usual action of a table."

This quotation describes a new and unexpected phenomenon resulting from feeding to a shaking table oiled phosphate pulp. It was an original and inventive act to feed such oiled phosphate pulp to a shaking table for the following reasons:

(1) It had never been the practice to treat oiled or otherwise conditioned pulp of any mineral on a shaking table. It was the practice of the art to treat on a shaking table only pulps composed of water and mineral untreated by any agents. Certain unsuccessful and abandoned experiments with sulphide ores in Australia, more than twenty years before Chapman and Littleford made their invention, are relied upon by the defendant. The Hebbard article and the Newman article of 1913 recite the evolution of the treatment at one of the mines in Broken Hill, Australia, from gravity concentration to the Cattermole granulation process and from the Cattermole process to froth flotation. The tabling work referred to in the Hebbard article was one of the unsuccessful efforts to treat accumulated old tailings at Broken Hill. This problem was finally solved by the discovery and application of the froth flotation process. These efforts to use table concentration for the recovery of sulphide mineral only instructed the art that the tabling of oiled minerals was useless as applied to sulphide minerals and did not suggest that oxide minerals, including phosphates, could be treated by such methods. Defendant read into the record a part of the testimony of George A. Chapman, deceased, given in June, 1919, describing the operations carried on in Australia in the year 1905. Chapman conducted the unsuccessful operations in Australia with tables of the general kind referred to in this suit. From the testimony of Chapman it appears that the tabling operations were unsatisfactory and abandoned. These operations were carried on for the recovery of sulphide ores and there is no mention of treating phosphates.

(2) Shaking tables had been used in the art of ore concentration only for the concentration of minerals in which the valuable particles and the gangue particles differed widely in specific gravity. In such cases, separation on a table had depended upon this difference in the specific gravities of the ore particles to be separated. In such table treatments, the valuable particles were the heavier and settled on the table between the riffles and passed off at the end of the table. The lighter gangue particles stratified on top of the heavier metalliferous particles and were washed by the water flowing across the table over the riffles and into the launder along the lower long side of the table. Chapman and Littleford knew that the difference in the specific gravity of phosphate and of the gangue was so slight that no separation could be based on it. Before they fed the oiled phosphate pulp to a shaking table they did not know what would happen. The phosphate being slightly heavier than the gangue, there was no certainty about the operation. To their surprise the slightly heavier phosphate particles in the form of loosely-bonded agglomerates stratified above the gangue and were washed across the table and the gangue was guided by the riffles to the end of the table. Before the experiment was tried it was impossible for any one in the light of the knowledge of the art to say that it would be successful.

(3) There was no experience in the prior art for the phenomenon of skin flotation of the phosphate particles on the surface of the water flowing across the table. The bursting of the bubbles in some of the loosely-bonded agglomerates as they came to the surface of the water in passing over the riffles and the consequent skin flotation of some of the phosphate particles in these agglomerates was an entirely new and unexpected phenomenon.

It is the loosely-bonded agglomerates in the phosphate mineral pulp that caused the separation of the phosphate from the gangue on the table. Loosely-bonded agglomerates had never been recognized in any pulp of any mineral. Chapman and Littleford discovered them in an oiled phosphate pulp and discovered the way to utilize them for the separation of the phosphate from the gangue in that pulp.

## The Patent.

The Chapman and Littleford patent covers a process for "Concentration of Minerals." By concentration of minerals is meant the separation of a mineral substance into a worthless part called "tailing" and a valuable part called "concentrate." The specification states: "This invention relates to the concentration of minerals, and is herein illustrated as applied to the concentration of the phosphate commercially known as bone phosphate of lime from naturally occurring phosphate-bearing material."

The specification further states: "Many phosphate particles float on the water surface as a skin or film float and are carried off into the concentrates launder 11 by the transversely flowing stream of water. Other phosphate particles, many of them in flocks associated with air bubbles, form aggregates or loosely bonded agglomerates and, in suspension in the water, or resting lightly on the silica or other impurities are carried transversely, separating themselves from the endwise movement of the other particles by the usual action of a table."

This paragraph describes the phenomena which occur on the table. Phosphate and gangue particles have almost the same specific gravity and differ only very slightly as to size. Without the use of reagents it is impossible to make a separation of such particles on a shaking table. From the paragraph quoted it appears that a separation of the phosphate and gangue particles is due to the oiling of the phosphate particles and the consequent formation of both the "loosely bonded agglomerates" and "film float" which is on the water surface. The specification continues: "In one test phosphate-bearing material was made into a thick pulp and treated with caustic soda in solution equivalent to 0.4 pounds per ton of solids, then mixed with 1.2 pounds red oil (oleic acid) and four pounds of fuel oil, both per ton of solids. This formed soap and left the fuel oil as an oily material which coated the phosphate particles."

All 22 claims of the patent are in suit. Claims 2, 5, 6, 14, and 21 are pointed out as typical. Claim 2, with explanatory notes, is quoted below:

"2. The process of concentrating phosphate ore which comprises adjusting the water content of the finely-divided ore to insure having all the particles thoroughly wetted and adding a selective flocculating agent to the ore, [alkali plus soap plus fuel oil]

mixing said agent with the ore to form a thin film or coating of said agent on each phosphate mineral particle and to at least in part form loosely bonded agglomerates of said particles,

then subjecting the mixture to agitative wet stratifying classification according to the relative settling values of the treated mineral and the gangue [phenomena which occur on the table] and

gathering the phosphate in an overlying stratum."

Claim 21 covering skin flotation as well as wet stratifying classification, with explanatory notes, is quoted below:

"21. The process of concentrating phosphate ores which consists in

adjusting the water content of the finely divided ore to insure having all the particles thoroughly wetted and

adding a selective flocculating agent [alkali plus soap plus fuel oil] to the ore,

mixing said agent with the ore to form a thin film or coating of said agent on phosphate particles and to at least form in part loosely bonded agglomerates of said particles,

then subjecting the mixture to agitative wet stratifying classification, [on a reciprocating table] and

collecting a portion of the phosphate as a float [skin flotation] on the water and

a portion of the phosphate in an overlying stratum [the loosely-bonded agglomerates] in the water."

## The Christensen Patent.

The Christensen patent is set up as a complete anticipation of the patent in suit. This patent issued September 11, 1923, and is for a "Process of Concentrating Oxidized Ores and Minerals." It is a mere paper patent. It was purchased by defendant after its tabling operations had been carried on for some twenty months in accordance with the patent in suit. Does the Christensen patent disclose the invention of the patent in suit? Professor Taggart, defendant's expert, in his Hand Book of Ore Dressing, 1927, digested the Christensen patent in the following words: "Christensen [1,467,354/1923] describes a non-sulphidizing process for concentrating oxidized ores and, more generally, for separating non-silicate non-metallic min-

erals from silicates by froth flotation. Essentially the treatment comprises the agitation-froth process with the following limitations; (1) the ore should be ground and oiling of the pulp carried on out of the presence of metals, i. e., grinding in a pebble mill and oiling in an agitation machine with non-metal walls and a non-metal, or at least, not an iron, impeller. (2) The oil should be one containing a goodly proportion of a fatty or resin acid or a similar compound. Typical oils of this class are fish oils, such as menhaden or salmon oil; * * * oleic and stearic acids; rosin dissolved in kerosene or coal-tar oil. (3) The quantity of oil should be relatively large, e. g., 10 to 15 per cent. of the weight of the minerals to be concentrated. * * * (4) The water of the pulp should be free of electrolytes."

The process of the Christensen patent is described as consisting of four steps.

The first step is fine grinding. This grinding is carried on to a suitable · size for the flotation operation "in most cases to 80 mesh or finer." Grinding to 80 mesh means that the largest particles will pass through an 80 mesh screen or be smaller in diameter than a 160th part of an inch. Fine grinding is characteristic of all froth flotation processes. Christensen undoubtedly had in mind the fine grinding of the froth flotation process, because in 1918 that process was well established and extensively used.

The second step is "the selective oiling and selective oil-flocculation of the mineral particles to be concentrated." Mineral oils such as fuel oil are stated by Christensen to be useless in his process. The oils recommended are the fatty acids and the fixed oils. As to the amount of oil the Christensen specification says: "That the oil or oily compound be used in sufficient quantities to prevent the carrying of much of the siliceous gangue-minerals into the concentrates, an approximate minimum amount equal to 10 per cent. more or less, of the weight of the concentrates."

The amount of oil necessary is illustrated by numerous examples showing that the amount is between 10 and 15 per cent. of the weight of the concentrates, or 200 to 300 pounds of oil for each ton of concentratable material in the ore to be treated. The process of the patent in suit does not involve the use of an active oil of the Christensen process. The fuel oil used in the Chapman and Littleford process is a mineral oil which, according to Christensen, is inactive and useless. In the patent in suit the proportion of oleic acid is only 1.9 pounds per ton of feed or 5.32 pounds per ton of concentrates. The Christensen process requiring 200 or 300 pounds of oleic acid to the ton of material to be concentrated is far removed from the process of the patent in suit. The result of the use of 10 to 15 per cent. of oil (200 to 300 pounds) on the concentrated material is the formation of oil-mineral floccules containing mineral particles stuck together by the large amount of oil. The oil-mineral floccules are characteristic of the Christensen process.

The third step of the Christensen process is "the levitation of the oil-mineral floccules." The Christensen specification states that the pulp is vigorously agitated "in such a manner as to break up the oil into fine globules and inject numerous fine air bubbles into the pulp and thoroughly mix these and the mineral particles in the pulp." Thus are formed buoyant oil-mineral-bubble floccules containing sufficient air to bring them to the water surface and form upon the surface a bubbly mass of very oily material. The mineral particles are not individually attached to air bubbles. Christensen's buoyant oil-mineral-bubble floccules are very different from the "loosely bonded agglomerates" of the Chapman and Littleford patent in suit which contain so little oil that the oil has no cohesive properties whatever but simply imparts to the particles the capacity to attach themselves to air bubbles thereby forming loosely joined masses of mineral and air bubbles with no apparent oil.

The fourth step is the separation of the oil-mineral-bubble floccules from the remainder of the pulp. The Christensen specification states:

"The last step, the separation of the levitated floccules or oil-mineral-bubble floccules, is brought about by allowing previously agitated pulp to come to a relatively quiescent condition so that the buoyant oil-mineral-bubble floccules may come to the surface of the pulp. The mass of buoyant floccules thus formed, may then be skimmed off the surface of the water by mechanical means, or allowed to accumulate until they reach a depth sufficient to cause them to overflow over an edge of the vessel (which should be · very slightly higher than the level of the pulp). * * *

"Also it is perfectly obvious that the ore-minerals may first be selectively concentrated into oil-mineral-bubble floccules and then be allowed to lose their bubbles and settle as less buoyant oil-mineral floccules and these can then be separated from the remainder of the pulp by any suitable washing or concentrating process and machinery of the same kind as those now in general use in the ordinary mechanical concentration of sulphide minerals, but this is not a preferred method, though it can be used and will give good results in many cases."

Thus it appears oil-mineral-bubble floccules are first to be formed "and then be allowed to lose their bubbles and settle as less buoyant oil-mineral floccules." There is no statement as to how they are to lose their bubbles or as to the method of separation to be carried on with the deaerated floccules reduced by such deaeration from oil-mineral-bubble floccules. Plaintiff's expert following exactly the disclosure of the Christensen specification produced buoyant oil-mineral-bubble floccules and then allowed them to lose their bubbles and settle as less buoyant oil-mineral-bubble floccules by an agitation that drove out some of the air, producing a nonfloating condition. He then endeavored to separate the material on a table and found there was no separation.

Christensen lays great stress upon the fact that the grinding must be out of contact with iron or steel. He also warns against contact with iron parts in the mixing operation. The process of the Chapman and Littleford patent in suit is always carried on in iron vessels, in fact in contact with iron throughout the process.

A summary of the differences between the process of the patent in suit and that disclosed in the Christensen patent follows:

| Patent in suit | Christensen patent |
| --- | --- |
| The Chapman and Littleford process is primarily for the concentration of mineral phosphate. | The Christensen process does not disclose a concentration of mineral phosphates. The term "phosphates" once used incidentally in the Christensen specification does not refer to mineral phosphate but to phosphates of the base metals. |
| The Chapman and Littleford process is applied to a deslimed coarsely granular feed. | The Christensen process is applied to a very finely ground and slimy feed. |
| The Chapman and Littleford process is carried on in contact with iron throughout the process. | Christensen excludes contact of the pulp with iron and steel as destructive of his process. |
| In the process of the patent in suit no oil-mineral-bubble floccules are formed. | In the Christensen process separation depends upon the formation of what Christensen terms "buoyant oil-mineral-bubble floccules." |
| The Chapman and Littleford process depends for its operation on the formation of loosely-bonded agglomerates which are mineral particles such as phosphate mineral particles fastened to minute air bubbles. These agglomerates are heavier than water but slightly lighter than the gangue. | In the Christensen process no such loosely-bonded agglomerates are formed. |
| In the process of the patent in suit, no very dilute pulp is used. | In the Christensen process, formation of oil-mineral floccules and levitation of them is accomplished in very dilute pulp. |
| Chapman and Littleford use an inert petroleum oil such as fuel oil containing no fatty acid. Furthermore, fixed oils are useless in the Chapman and Littleford process. | Christensen to oil the mineral, uses a fatty acid or a fixed oil. |
| Chapman and Littleford use no large amount of oil; instead, they use oil to the extent of about ¼ to ½ of 1 per cent. on the weight of the mineral phosphate. | Christensen uses the oily substance in the proportion of 10 to 15 per cent. on the weight of the mineral to be concentrated. |
| In the Chapman and Littleford process, soap is one of the principal agents used. | In the Christensen process, soap is forbidden. |
| In the Chapman and Littleford process alkali is used. | In the Christensen process alkali is forbidden. |
| The Chapman and Littleford process is conducted in the presence of the electrolytes which Christensen says are harmful. | The Christensen process must be carried on in the absence of harmful electrolytes. It is stated that most of the electrolytes are harmful. |
| The Chapman and Littleford process is in extensive use. | No practical use has been made of the Christensen process. |

In relying upon the patent to Christensen, defendant relies, not upon what it

meant to those skilled in the art prior to the solution of the problem by Chapman and Littleford, but upon how experts read it after Chapman and Littleford have solved the problem. We are now prepared to answer the question whether the Christensen patent discloses the invention of the patent in suit. Clearly it does not.

### Prior Art.

Aside from the Christensen patent, the principal patents and publications relied upon by the defendant to invalidate the patent in suit are set out in the margin.[1]

Everson patent, No. 348,157, issued in 1886. It was based upon her discovery that metallic substances when pulverized will unite with compounds of fats or oils and acids and that such compounds will not unite with pulverized quartz or other rocky gangue. It is a paper patent. It is for the treatment of base metals and precious metal ores, especially sulphides. The process uses no alkali and no soap but is carried on with an acid or a neutral pulp. Air is not used and no agglomerates of any kind are formed. Suspension of individual particles in oil is characteristic of the Everson process. There is no disclosure or suggestion of the formation of loosely-bonded agglomerates of metalliferous mineral particles held together by air bubbles.

Cattermole patent, No. 763,260, is also a paper patent. The Cattermole process is a metal-sinking and not a flotation process. It involves the use of a large amount of oil with considerable agitation to form shot-like granules stuck together by the coherence of the oil coating them. The specific gravity of the granules is sufficient to cause them to sink. Although soap was used in this process, it was merely for the purpose of assisting in the distribution of the large amount of oil used and not for the purpose of conditioning the mineral, as in the process of the patent in suit. No agglomerates are formed in this Cattermole process.

Sulman, Picard and Ballot patent, No. 835,120, issued in 1906, is the basic patent of the froth flotation art. The process was limited to sulphides and the like. It depends upon the formation of mineralized bubbles which are lighter than water and rise to the surface in the form of a foam or froth holding for recovery the extracted metal. Agglomerates of the patent in suit are not formed nor is separation affected by a shaking table.

Sulman, Picard and Ballot, No. 879,985, was based upon efforts to solve the problem of the Australian dumps. The process is for the treatment of sulphide ores and has no application to oxidized ores or minerals. The patent discloses what was experimentally done in Australia in the unsuccessful efforts to recover by table treatment and flotation some of the sulphides not recovered by the Cattermole metal-sinking process. No loosely-bonded agglomerates are formed. There is no gravity concentration or separation beneath the surface of the water.

The patents to Broadbridge & Edser, Trotter & Wilkinson and Littleford, owned by plaintiff, relate only to froth flotation. They contain no reference to tabling or wet stratifying classification.

Chapman and Littleford patent in suit covers a new method of concentration of minerals, particularly phosphate minerals, not disclosed or suggested by the prior art. The invention was the result of the discovery that loosely-bonded agglomerates of the valuable mineral particles are formed when the pulp of the ore is conditioned in the manner and with the agents described in the patents; and the further surprising discovery that such loosely-bonded agglomerates will separate from the gangue by gravity classification, particularly on a shaking table. Until the Chapman and Littleford process in 1929 no one had concentrated phosphate mineral too small for screening and washing and too large for froth flotation.

The process of the patent in suit has been in extensive commercial use by the

[1] Everson, No. 348,157, August 24, 1886; Cattermole, No. 763,260, June 21, 1904; Sulman, Picard and Ballot, No. 879,985, February 25, 1908; Sulman, Picard and Ballot, No. 835,120, November 6, 1906; Sulman, No. 835,143, November 6, 1906; Broadbridge and Edser, No. 1,547,732, July 28, 1925; Shapley, No. 1,689,693, October 30, 1928; Trotter and Wilkinson, No. 1,- 795,100, March 3, 1931; Littleford, No. 1,780,022, October 28, 1930; Cattermole, British No. 17,109 of 1903; Hebbard "Evolution of Minerals Separation Process on Central Mine," Proceedings of Australasian Institute of Mining Engineers, 1913; and Newman "Broken Hill Treatment Methods," The Australian Mining Standard June 26, 1913.

plaintiff since 1929. Its value is also attested by the fact that defendant began using it with one table in March, 1932 and has been using it with 21 tables in the plant which defendant put into operation in February, 1934.

## The Law.

■ In this case the principal defense is anticipation. Anticipation means the disclosure in the prior art of a process substantially identical with the process of the claims in suit.

"Inferences as distinguished from disclosures, especially when drawn in the light of after events, cannot be accepted as a basis of anticipation. A patent relied upon as an anticipation must itself speak. Its specification must give in substance the same knowledge and the same directions as the specification of the patent in suit. Otto v. Linford, 46 Law T.(N.S.) 35, 44. It is not enough to prove that a method or apparatus described in an earlier specification can be made to produce this or that result. Flour Oxidizing Co. v. Carr & Co., 35 R.P.C. 457. A singularly sensible test of the rule of anticipation is given in British Thomson-Houston Co. v. Metropolitan Vickers Electrical Co., 45 R.P.C. 22, by asking the question—'Would a man who was grappling with the problem solved by the patent attacked, and having no knowledge of that patent, if he had had the alleged anticipation in his hand, have said: "That gives me what I wish?"' The Pope Alliance Corporation v. The Spanish River Pulp & Paper Mills, Ltd., (Privy Council Appeals No. 33 of 1928). On the evidence in this case, read in the light of the rules of law applicable to anticipation, we do not find the inventon of the patent in suit anticipated." Skelly Oil Co. v. Universal Oil Products Co., 31 F.(2d) 427, 431 (C.C.A.3)

"Many things, and the patent law abounds in illustrations, seem obvious after they have been done, and, 'in the light of the accomplished result,' it is often a matter of wonder how they so long 'eluded the search of the discoverer and set at defiance the speculations of inventive genius.' Pearl v. Ocean Mills, Fed.Cas.No.10,876, 11 Off. Gaz.Pat.Off. 2, 2 Ban. & A. 469. Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skilful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not." Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 434, 31 S.Ct. 444, 447, 55 L.Ed. 527.

The test of anticipation prescribed in the above cases is not met by the prior art cited.

■ Lack of patentable novelty cannot be proved by showing that all features of the combination may be found by selecting features from a number of patents in the prior art. Universal Oil Products Co. v. Winkler-Koch E. Co., (D.C.) 6 F.Supp. 763; McMichael & Wildman Mfg. Co. v. Ruth (C.C.A.) 128 F. 706, 708; Parks v. Booth, 102 U.S. 96, 26 L.Ed. 54; Bates v. Coe, 98 U.S. 31, 25 L.Ed. 68.

■ This court finds the patent in suit good and valid in law. The court further finds that defendant's operations infringe the claims of the patent in suit. Plaintiff is entitled to an injunction and accounting.

The opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule 70½, 28 U.S.C.A. following section 723.