**GUARDIAN TRUST CO. et al. v. DOWNINGTOWN MFG. CO.**

**DOWNINGTOWN MFG. CO. v. GUARDIAN TRUST CO. et al.**

Circuit Court of Appeals, Third Circuit.
December 1, 1928.

Rehearing Denied January 7, 1929.

Nos. 3838, 3839.

Buffington, Circuit Judge, dissenting.

Fraley & Paul, of Philadelphia, Pa. (Henry N. Paul, of Philadelphia, Pa., and Osgood H. Dowell, of Chicago, Ill., of counsel), for Guardian Trust Co.

Howson & Howson, of Philadelphia, Pa. (Charles H. Howson, of Philadelphia, Pa., of counsel), for Downingtown Mfg. Co.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. This was a suit brought by the Guardian Trust Company, trustee, and the Paper & Textile Machinery Company, against the Downingtown Manufacturing Company, defendant, for the infringement of United States letters patent No. 1,025,822, for improvements in paper-making machines, issued to William H. Millspaugh on May 7, 1912. The plaintiffs own the patent and charge that the defendant infringes it by the manufacture and sale of suction couch rolls with the knowledge and intent that they were to be used in machines embodying the invention of claims 2, 3, and 5 of the patent.

The trial court held that the patent was valid and infringed by the defendant in the installation of its suction rolls in a so-called "St. Regis" machine; but that it was not infringed by installations in which Nash rotary pumps were used. The plaintiffs appealed from so much of the decree as holds that the use of the defendant's rolls with Nash rotary pumps does not infringe, and the defendant appealed from so much as holds the patent valid and infringed by the use of its rolls in a St. Regis machine.

The invention relates to improvements in Fourdrinier paper-making machines. This improves the machine, plaintiffs say, in operation and in the quantity and quality of its products.

For many years in the paper-making industry, the wet pulp web, after it had been laid on the conveyor, called the making-wire and drained by the successive actions of gravity, table rolls, and flat suction boxes, was subjected to the wringing or squeezing action of a pair of large coacting rolls, known as the top and bottom couch rolls, in order to press sufficient water out of the web or sheet and reduce it to the necessary firmness and dryness to enable it to be removed from the making-wire and undergo the usual, subsequent pressing, drying, and calendering operations. This method of making the paper sheet was troublesome and slow, and left it in such condition as often to be damaged and broken when being run through the presses and dryers. No substitute was known, it is contended, for this risky and troublesome operation until Millspaugh "discovered that by including in the region of the couch roll a continuous draft through the sheet of a constant, large volume of air, by employment of a continuously positive-acting high vacuum, he could do away with the top couch roll altogether, and eliminate from the sheet the moisture that previously had to be mechanically expressed, with as effective and far more advantageous results than had ever before been attained."

The three claims in issue describe and claim in varying language a new combination in the Fourdrinier machine of a suction roll with a positive rotary vacuum pump which removes moisture from the wet paper web while on the making-wire, by forcing large quantities of air uniformly through it in the region of the couch roll. The plaintiffs describe the results of the invention as follows: "This invention transformed the Fourdrinier. The new moisture-removing operation, applied in the place of the former expressing operation, obtained an improved drying and consolidating effect, enabling the paper to be made not only without shock or stress in the wet sheet, but also in a highly satisfactory state of such uniform firmness and sufficiently low and uniform moisture content as to be better receptive to the ensuing pressing and drying operations and better adapted to be safely handled off the wire and passed through the pressers and dryers, at the usual fast Fourdrinier speeds, or faster speeds. Thus the invention enabled paper to be made successfully, without the hazards accompanying the use of the old compressively acting couch rolls, at the normal or increased operating speeds. It was the first to accomplish any such result. It was the first machine ever known to the art by which the paper could be made without mechanical compression on the making-wire, at the then usual fast or even faster speeds, as a properly made wet paper sheet in condition to be removed from the wire and to withstand the normal pressing and drying operations at those speeds."

While the web or sheet was running along the making-wire, much of the water, as above stated, was immediately drained off by gravity through the meshes of the wire. As the wire, carrying the solution of water and fiber, ran forward, over the supporting table rolls, gravity continued to take water out of the sheet, but as more of the water was drained

off and the solution became thicker, and the pulp particles adhered more closely together, the action of gravity alone was not sufficient to overcome capillary attraction and remove more water, and so some other agency was required. This was found in the compressive action of the top and botton couch rolls. These, however, were unsatisfactory because their heavy pressure frequently injured the web. Thereafter the top roll was eliminated, and reciprocating pumps attached to a group of flat suction boxes were used to draw a current of air through the web.

Marble D. Keeney, of Antioch, Cal., patented a suction box for paper machines in 1897 (No. 581,733). These boxes or rolls were placed on the market, and Curtis & Bro., of Newark, Del., purchased one in 1902. This took the place of the lower couch roll. It was used in connection with a Dean reciprocating pump. As a consequence the top couch roll was removed, and this suction roll and pump were used without the upper couch roll for eight years, and so successful was this in extracting water and moisture from the web that the web was self-sustaining and passed over the gap between the making-wire and the felt screen or receiver without support. The testimony clearly establishes that Curtis secured Millspaugh's "desired result." When the old Dean pump was worn out and had to be renewed, they substituted a Connersville rotary pump for it; but this produced no change in the mode of operation, the grades of paper made, or construction of machine used.

Claim 5 is the most specific. It has two pieces of mechanism, the revolving suction roll and a positive rotary pump.

But both of these were old. The patent No. 895,238 issued to Millspaugh August 4, 1908, was for "new and useful Improvements in Suction Rolls for Paper-Machines." He adopted the suction roll of that patent for use in the patent in suit. On page 2 at line 104 he said: "I prefer at present the construction of suction-roll shown and described in my U. S. Patent No. 895,283, dated August 4, 1908, though I do not limit myself thereto." The suction roll is also shown in other patents. In the patent No. 426,089, issued to Young and Davis, August 22, 1890, a suction roll mounted at the delivery end of the making-wire on a Fourdrinier machine is disclosed. The patentee stated that the object of the improvement was "to lessen the wear of the wire and produce a suction device that will effectually remove moisture from the pulp while upon said wire." The British patent, No. 15,669 (1887), issued to Black,

also disclosed a suction roll mounted at the delivery end of the making-wire. These rolls were not commercially successful, but Millspaugh said this was due to imperfections in mechanical construction and operation which he proposed to remedy in his first patent. In the specifications in that patent he said: "As the pulp-conveying web passes over or partially around the roll, the latter being perforated or fenestrated, the extraction of moisture is effected by suction or creation of a vacuum inside the roll, which for that purpose contains a non-rotative suction box or chamber in communication with a vacuum pump or exhaust apparatus; the open top of said suction-box being in close contact with the interior surface of the roll. Although these suction-rolls, revolving with the same surface speed as that of the pulp-conveying web possess the advantage of avoiding friction and wear on the wires or tearing of the felts, yet they have not heretofore been brought to a satisfactory degree of perfection, either in mechanical construction or character of operation. A material defect has been the difficulty of maintaining the suction-box in air-tight contact with the roll, so as to effectively utilize the suction, while at the same time obtaining the exact degree of pressure desired and preventing the box from becoming locked to the roll, especially under influence of a heavy suction or substantial vacuum. * * * Another usual deficiency in this class of devices, has been the lack of convenient means for setting the suction-box at different angular positions in the roll or cylinder, in order to adapt the latter to the line of travel of the pulp-conveying web," etc.

He did not claim to have originated the idea of extracting moisture from the web by means of the suction-box, but he did claim the discovery of the means of eliminating the defects from the box so as to make it effective.

At the time of Millspaugn's application, the positive rotary pump had been manufactured for some years by two companies, the Connersville Blower Company of Connersville, Ind., and the Roots Pump Company of the same place. The pumps of these companies differed only in the shape of their impeller blades. The Connersville Blower Company pump, "having oppositely-revolving cycloidal impellers," was adopted by the patentee and thereafter referred to by him as the positive rotary pump.

Millspaugh, therefore, brought together two old elements and applied them to the Fourdrinier machine to extract water and

moisture from the sheet by drawing large volumes of air uniformly through it. Did this constitute invention? The defendant says that it did not because the combination of these two elements in the natural development of the art was what might be expected from a skilled mechanic.

The need of a continuous volume of air passing through the web to extract moisture from it was recognized long before Millspaugh. To accomplish this, equalizing chambers were used in connection with reciprocating pumps attached to flat suction boxes located between the tube-rolls and the delivery end of the conveyor or making-wire. This eliminated the pulsations of the pumps and maintained a uniform vacuum. In his specification in the patent in suit, Millspaugh recognized this fact, and said: "Reciprocating piston pumps are commonly employed in Fourdrinier machines, and such pumps cannot produce uniform suction or air current except by the use of very large vacuum-equalizing or receiving tanks in connection with such pumps which are very cumbersome and open to many objections and seldom if ever accomplish the desired result."

The positive rotary pump, defendant says, was not only well known, but had gone into actual use in the paper-making machine art as a vacuum pump for the purpose of furnishing a substantial vacuum and a constant uniform draft of air through the sheet. It cites the uses by F. W. Bird & Son, Du Pont, and MacAndrews & Forbes as authority for these statements. They used Roots positive rotary pumps or "blowers" to create a vacuum in making paper. Bird & Son made thick felt paper. The others made paper or pulp kegs. Plaintiffs say that these uses are not anticipatory because they were used "for non-analogous service as low duty exhausters in non-analogous machines," and not in connection with Fourdrinier machines; that the Bird "cylinder mold was only a frail mold which could not have sustained any great pressure"; and that all the other machines used by Du Pont and MacAndrews & Forbes were operated at a very low pressure.

All this may be true, but the fact is that these positive rotary pumps were used to create a uniform vacuum in making paper. While the machines might have been operated at low pressure and in consequence produced a low vacuum, yet this is only a matter of degree, not a difference in principle of operation, and shows the recognition and practical solution of the problem contained in the invention. The fact of usage on Fourdrinier machines, as distinguished from other machines, did not in itself constitute invention.

Like others, Millspaugh saw the need of a uniform vacuum and was looking for a pump best fitted to produce it. He inquired of the Connersville people about their pumps, and they showed him a positive rotary pump, having "oppositely-revolving cycloidal impellers" which he took and used on a Fourdrinier machine. We are satisfied that, in the state in which Millspaugh found the art, the substitution, on a Fourdrinier machine, of a positive rotary pump for a reciprocating pump with or without an equalizing tank, did not amount to patentable invention.

The part of the decree holding the claims in suit valid and infringed is reversed, and part holding them not infringed is affirmed.

BUFFINGTON, Circuit Judge (dissenting). From about 1803 the paper-making device of Fourdrinier continued in use without change or improvement for 100 years. An improvement was then made by a firm at Newark, Del., which made high-grade paper of marked tensile strength. This improvement in paper of such strength made no change in the Fourdrinier machine practice in making the flimsy paper of the newspaper art. The subsequent great change and improvement of the Fourdrinier machine, by which it is speeded up to continuously and without break handle the forming web of a great newspaper roll—an improvement which has tremendously increased the speed, sheared the process of brakedowns with consequent delays, and greatly increased the output—came through Millspaugh and no one else. Had the art stopped with the improvement in the mill at Newark, Del., the newspaper art would not have been changed or improved. The practical newspaper art has evidenced its appreciation of Millspaugh's improvement by the general licensing under his patent, and because this decision fails to reward him for his inventive improvement, I record my earnest dissent.