## SOUTHERN PHOSPHATE CORPORATION v. PHOSPHATE RECOVERY CORPORATION.

### No. 6498.

Circuit Court of Appeals, Third Circuit.

Feb. 14, 1939.

Rehearing Denied March 28, 1939.

BIGGS, Circuit Judge dissenting.

William H. Davis and John F. Neary, both of New York City, and E. Ennalls Berl, of Wilmington, Del., for appellant.

Hugh M. Morris, of Wilmington, Del. (Robert H. Richards, of Wilmington, Del., and Henry D. Williams and Howard M. Morse, both of New York City, of counsel), for appellee.

Before BUFFINGTON, DAVIS, and BIGGS, Circuit Judges.

BUFFINGTON, Circuit Judge.

By reference to the opinion of the court below, reported in 20 F.Supp. 153, 154, we avoid needless repetition. It will there appear that in a suit for infringement brought by plaintiff, assignee of Patent No. 1,968,008, granted July 24, 1934, to George A. Chapman and John W. Littleford, for "Concentration of Minerals", the court held the patent valid and infringed. Thereupon defendant took this appeal and, as infringement is admitted if the patent is held valid, the sole question here involved is validity. After hearing and due considera-tion had, we find ourselves in accord with the court below. We might well affirm on the comprehensive and able opinion of the trial Judge, but in view of the importance of the case and the earnest contention of counsel, we here record some of the facts and reasons which logically force us to affirm.

The accepted practice of the art prior to the patent is thus described by Judge Nields:

"The principal source in the United States of calcium phosphate used as a raw material by the fertilizer and chemical industries is the so-called Pebble Phosphate Rock Field of Florida. Under an 'over-burden' of earth and sand varying in depth from 5 to 25 feet, lies a stratum or 'matrix' of phosphate mineral varying in thickness from 3 to 12 feet. The business of the Florida phosphate industry is to mine this phosphate mineral and to remove from it the silica and clay. 'Phosphate concentrates' thereby produced are sold to the fertilizer and chemical industries. The overburden is removed by huge scoops operated by powerful machinery and piled in long ridges. This leaves the stratum of phosphate material exposed. It is then mined hydraulically. This hydraulic mining disintegrates the stratum of phosphate ore by means of powerful streams of water. The mixture of ore and water is pumped to a 'washing' plant through an iron pipe a foot in diameter.

"The phosphate washing plant separates the silica and clay from the phosphate particles and screens out the coarser phosphate material. Much of the clay is washed out. A large proportion of the phosphate mineral is of such a size as to be easily separated from the gangue by washing and screening. About 50 per cent. of the phosphate is thus removed in the form of a finished product suitable for market.

"The remaining 50 per cent. of the phosphate passes through the screens in the washing plant along with the major part of the silica and other impurities. Until about 1927, this finer material, known in the industry as 'washer waste,' 'washer tailings,' or 'debris,' was regarded as unconcentratable and was sent to waste. Such washer waste was allowed to flow away frequently into pits from which phosphate mineral had been mined. The solids settled there. Such 'dumps' are scattered over the Florida phosphate field. They contain many millions of tons of phosphate in the

792

form of fine phosphate particles mixed with silica and clay. The loss involved in sending to the dumps 50 per cent. of the phosphate was fully understood."

In the art prior to the patent in suit shaking tables were well known and their possibilities used, but all known use of them secured no more than 50 per cent. recovery of phosphate, while the remaining 50 per cent. passed into the dump. The recovery of such percentage was due to the fact that they separated phosphate from clay, silicon and the like only where the component particles varied widely in size, shape or specific gravity, and that they did not and could not. separate the residue which consisted of the minute particles of. phosphate, silicon, clay and the like, which did not differ widely in size, shape or specific gravity.

The gist of plaintiff's patent was adding to the table practice of the old art a co-operating factor which revolutionized the art and made possible a very large recovery of phosphate from the minute particles in the dumps. In that regard the court held:

"Shaking tables had been used in the art of ore concentration only for the concentration of minerals in which the valuable particles and the gangue particles differed widely in specific gravity. In such cases, separation on a table had depended upon this difference in the specific gravities of the ore particles to be separated. In such table treatments, the valuable particles were the heavier and settled on the table between the riffles and passed off at the end of the table. The lighter gangue particles stratified on top of the heavier metalliferous particles and were washed by the water flowing across the table over the riffles and into the launder along the lower long side of the table. Chapman and Littleford knew that the difference in the specific gravity of phosphate and of the gangue was so slight that no separation could be based on it. Before they fed the oiled phosphate pulp to a shaking table they did not know what would happen. The phosphate being slightly heavier than the gangue, there was no certainty about the operation. To their surprise the slightly heavier phosphate particles in the form of loosely-bonded agglomerates stratified above the gangue and were washed across the table and the gangue. was guided by the riffles to the end of the table. Before the experiment was tried it was impossible for any one in the light of the knowledge of the art to say it would be successful.

"There was no experience in the prior art for the phenomenon of skin flotation of the phosphate particles on the surface of the water flowing across the table. The bursting of the bubbles in some of the loosely-bonded agglomerates as they came to the surface of the water in passing over the riffles and the consequent skin flotation of some of the phosphate particles in these agglomerates was an entirely new and unexpected phenomenon.

"It is the loosely-bonded agglomerates in the phosphate mineral pulp that caused. the separation of the phosphate from the gangue on the table. Loosely-bonded agglomerates had never been recognized in . any pulp of any mineral. Chapman and Littleford discovered them in an oiled phosphate pulp and discovered the way to utilize them for the separation of the phosphate from the gangue in that pulp."

This surprising and unlooked for result the patent effected through the element "adjusting the water content of the finely-divided ore to insure having all the particles thoroughly wetted and adding a selective flocculating agent to the ore." In that regard the proof is that "the Chapman and Littleford process depends for its operation on the formation of loosely-bonded agglomerates which are mineral particles such as phosphate mineral particles fastened to minute air bubbles. These agglomerates are heavier than water but slightly lighter than the gangue." And in answer to the court's inquiry, "Do you find the loosely-bonded agglomerates in any process other than the patent in suit?" the defendant's expert—and we find no proof to the contrary—testified: "A. Of my own experience? Q. Among those here cited? A. No." Moreover in that. regard the court found that: "Chapman. and Littleford patent in suit covers a new method of concentration of minerals, particularly phosphate minerals, not disclosed or suggested by the prior art. * * * Until the Chapman and Littleford process. in 1929 no one had concentrated phosphate mineral too small for screening and washing and too large for froth flotation."

The novel use of the table is shown by what may be called the revolutionary change of table operation in the fact that. in the standard Wilfrey table, "the heavy concentrate grains going into the lower layers, and the lighter waste grains into. ,

the upper", while in the use of the table as affected by "adding a selective flocculating agent" was such that as stated in the specification "phosphate particles ride on the surface of the water, while silica and other impurities are wetted and tend to sink."

That the process of the patent was a working surprise is shown by the evidence. In that regard the proof by plaintiff's expert is, "Those loosely-bonded agglomerates were a revelation to me when I saw them in Florida. I was surprised to see the particular structure in question and to see how they were made use of in the process of the defendant and plaintiff alike." Indeed it seems the defendant's expert agrees therewith when he says: "Either by reason of the stirring rod that was effected here, or by reason of the plunge of the material from the feed through into the tank, a surprising amount of air is entrained and much of it attached to the oiled phosphate particles." How this phenomenal and unexpected result is effected and utilized is stated, for example, in representative claim 2 of the patent, which reads: "The process of concentrating phosphate ore which comprises adjusting the water content of the finely divided ore to insure having all the particles thoroughly wetted and adding a selective flocculating agent to the ore, mixing said agent with the ore to form a thin film or coating of said agent on each phosphate mineral particle and to at least in part form loosely bonded agglomerates of said particles, then subjecting the mixture to agitative wet stratifying classification according to the relative settling values of the treated mineral and the gangue and gathering the phosphate in an overlying stratum."

So far as the claims here in controversy are concerned, the element "a selective flocculating agent" is stated in claim 3; "adding selective agents to the thus wetted ore", in claim 3; "a fraction of 1 per cent. of sodium soap and a fraction of 1 per cent. of petroleum oil", in claim 4; "a small proportion of soap and unsaponifiable oil", in claim 6; "a small proportion of a soap-forming radical and alkali and an unsaponifiable oil", in claim 14; and "a selective flocculating agent", in claim 21.

At this point we venture to state our conjectural understanding of the phenomenal separation process, which undoubtedly takes place, and our physical reasons why

it does occur. We start with the fact that while in the table practice of the old art a separation of the large phosphate particles, to the extent of 50 per cent. was effected, yet there still remained unaffected a large quantity of mingled and minute particles of phosphate and silicon, sand and clay. To the separation and recovery of these phosphate particles the patent is addressed.

As the agitation of the table proceeded, air bubbles formed which tended to rise to the surface. The "selected flocculating agent", now for the first time used in tabling phosphate, also rose to the surface of the water and in its upward passage smeared or formed a scum or covering on the air bubbles. The silicon being an adsorbent, was not attracted to the oil coated air bubbles and, therefore, stayed in, or sunk to, the lowest stratum. On the other hand, the phosphate particles, thoroughly wet and smeared with a coating of oil, and being attracted to the rising oil coated air bubbles, were by them buoyed to the surface of the water. The result was that as the shaking process proceeded, the phosphate or pulp particles were washed over the riffles or dam and were recovered, while the silicon, clay or gangue remained in the lower level, could not pass over the riffle and was carried to the dump.

As we view it, such action is disclosed in the patent specification, which says: "According to the present invention, the concentration is effected by procedures which may include skin or film flotation in which phosphate particles ride upon the surface of water while silica or other impurities are wetted by the water and tend to sink. * * * The process may be carried on or aided by table concentration wherein the silica, which tends to sink in the water flowing over the table, is carried off in the general direction of the riffles, while the phosphate particles, carried in or on the water flowing across the riffles of the table, are delivered to a concentrate launder, and are thereafter de-watered. The phosphate-bearing material is herein described as made easily amenable to such skin flotation or water-flowing separation or both by prior treatment, as with an alkaline substance, or with soap and oil, or with alkali and a saponifiable oil. Variations of treatment may produce skin flotation, water flowing separation with differential separation under wet stratifying conditions, or both. Where an oil is used the

oil selectively coats phosphate particles, making them more amenable to separation."

Referring to the specification, the court held and found:

"This quotation describes a new and unexpected phenomenon resulting from feeding to a shaking table oiled phosphate pulp. It was an original and inventive act to feed such oiled phosphate pulp to a shaking table for the following reasons:

"(1) It had never been the practice to treat oiled or otherwise conditioned pulp of any mineral on a shaking table. It was the practice of the art to treat on a shaking table only pulps composed of water and mineral untreated by any agents."

 Seeing then the disclosure of the patent specifications was novel and of high value and as the proofs show, the question remains did it involve invention? We are clear that it did. In addition to the prima facies incidentally awarded to the grant of a patent, we have that presumption strengthened by the fact that it was granted after spirited litigation in interferences and after full consideration of the many earlier patents cited against it. The disclosure was revolutionary. The art recovered but one-half of the phosphate. It recognized this wasteful fact. It sought to improve it, but no solution came. To this stationary art the patent disclosed a great step forward. It did away with dump heaps known to contain a vast tonnage of phosphate and did for that art and for those wasteful dumps a major advance which ranked the recovery of the dump heap of phosphate with the salvage of culm banks of the coal art; the use of supposedly worthless slag of iron furnaces; and the supposedly worthless dumps of the gold mining industry. Such economic salvages merit the reward of patent protection. For these and other reasons which the length of this opinion suggests we do not discuss, but all of which we have duly considered, the decree below is affirmed.

BIGGS, Circuit Judge (dissenting).

The patent sub judice deals with a method of recovering phosphates. As has been stated, phosphates form deposits in certain areas of Florida where they lie buried beneath a few feet of sandy soil. The covering of earth is removed, the phosphate-bearing deposits are broken down by streams of water and the phosphates themselves with the soil are piped to washing plants where some of the phosphate particles are removed from the waste materials by screening. Only about 50 per cent. of the phosphate material that is so mined is recoverable. The smaller particles of phosphate material pass through the screens along with the sand and other waste material, known as gangue, and are carried to dumps. These dumps contain materials rich in phosphate, but no process was employed to make them available commercially. The patent in suit, Chapman and Littleford, No. 1,968,008, discloses a method for the recovery of such wasted phosphates.

The learned District Judge stated and found that since 1927 the appellee had solved the problem of recovering these wasted phosphate materials on a commercial scale by two new complementary methods. He stated: "One is particularly useful when both the phosphate and the silica particles are comparatively fine. This is the so-called froth flotation process. It is not involved in this case. The other method of separating phosphate particles from the silica particles in the tailings rejected by a washer plant is described in the Chapman and Littleford patent in suit. This so-called 'tabling' method is particularly useful for the treatment of material which contains particles too large to be satisfactorily treated by froth flotation. Of course, it is possible by grinding to reduce the coarse material to a size capable of being efficiently treated by froth flotation. Such grinding involves expense as well as loss of very fine material and should be avoided, if possible."

The appellee specifically contends that the discoveries of Chapman and Littleford were these: (1) When a phosphate-bearing material is made into a pulp or soap by being treated with agents (soap, alkali and fuel oil) loosely bonded agglomerates consisting of phosphate particles are formed, and (2) when the pulp or soap so formed is subjected in the gangue to the action of a shaking table the loosely bonded phosphate particles are separated from the gangue particles. The phosphate particles are recoverable since they move off to one edge, the "concentrates launder" of the shaking table, while the rest of the gangue, waste material, moves on to the end of the table. As stated by the appellee the sine qua non of the success of the process of the patent in suit is the formation of the loosely bonded agglomerates alleged to

have been discovered by Chapman and Littleford.

Claim 2 of the patent is typical. It is as follows: "The process of concentrating phosphate ore which comprises adjusting the water content of the finely-divided ore to insure having all the particles thoroughly wetted and adding a selective flocculating agent to the ore, mixing said agent with the ore to form a thin film or coating of said agent on each phosphate mineral particle and to at least in part form loosely bonded agglomerates of said particles, then .subjecting the mixture to agitative wet stratifying classification according to the relative settling values of the treated mineral in the gangue and gathering the phosphate in an overlying stratum."

Professor Gaudin, testifying for the appellee in rebuttal, stated in respect to the formation of the loosely bonded agglomerates, " * * * the minute smears of oil that are on the phosphate particle make it possible for these particles to become fastended to the air bubbles. The air bubbles are loose joints, because the particles can move around on the surface of the water. One particle fastens on to an air bubble, the air bubble fastens to another particle, and the other particle fastens to another air bubble. This does not go on in any one direction but in all directions, so that you have a more or less flexible and pliable and loosely-bonded agglomerate of gas bubbles and mineral particles."

The appellee contends that the formation of the loosely bonded agglomerates was a new and surprising phenomenon. It further contends that the well known principle of the. shaking table was put to a new and unexpectedly beneficial use to separate the phosphate particles from the gangue. In short Chapman and Littleford claim two complementary and contemporaneous inventions, the formation of the phosphate agglomerates and their separation from the gangue by the action of a shaking table.

The specification of the patent under adjudication provides in part as follows:

"According to the present invention the concentration is effected by procedures which may include, skin or film flotation in which phosphate particles ride upon the surface of water while silica and other impurities are wetted by the water and tend to sink; and which may include differential separation under wet stratifying conditions, and which may include both skin flotation and wet stratifying classification. The process may be carried on or aided by table . concentration wherein the silica, which tends to sink in the water flowing over the table, is carried off in the general direction of the riffles, while the phosphate particles, carried in or on the water flowing across the riffles of the table, are delivered to a concentrate launder, and are thereafter dewatered. The phosphate-bearing material is herein described as made easily amenable to such skin flotation or water-flowing separation or both by prior treatment, as with an alkaline substance, or with soap and oil, or with alkali and a saponifiable oil. * * *

"In the form of the invention herein illustrated, film or skin flotation and other procedures are carried out together on a shaking table of a general type used in effecting the concentration of metalliferous minerals."

It will be perceived that by the foregoing Chapman and Littleford provided that the phosphate concentration was to be effected by procedures which included skin or film flotation, plus the action of a shaking table of the general type used in connection with the concentration of metalliferous minerals. As is stated in the specification, the phosphate-bearing material is pulped, treated with caustic soda, then mixed with oleic acid and fuel oil. This forms a soap and leaves the fuel oil as an oily material which coats the phosphate particles. The thick pulp is then agitated as for flotation, fed to the table with more water and concentrated thereon by the vibrating action of the table and the transversely flowing water as stated above.

Now the treatment of pulped ores with conditioning agents similar to oil to make the particles of ore themselves amenable to separation from the gangue when this could not be accomplished by strict gravity concentration, was well known to the art of mineral separation. For example, such processes had long been used for the concentration of sulphide ores. They were not known to the early art, however, for the recovery of phosphate ores from the gangue because no method was known for preferentially oiling these mineral particles. Preferential oiling means the process of treating the constituents of ore deposits with oil in such wise as to cause the valued mineral particles to separate from the gangue. In short the process of preferential oiling of metalliferous ores was

well known to the art of mineral recovery, but the art did not know how to oil preferentially non-metalliferous, non-siliceous minerals, such as phosphates, in the presence of silica, the phosphate particles having approximately the same specific gravity as the silica particles with which they were mixed. Apparently it was first presumed that if oil was injected into the pulp, preferential oiling could not be accomplished, no substantial difference in the falling rate of the particles of phosphate and the particles of gangue being effected thereby.

In United States Patent No. 1,467,354, issued to Niels C. Christensen upon September 11, 1923, upon an application filed December 14, 1918, a process is disclosed " * * * in general applicable to the concentration of the non-silicate oxidized minerals and the separation of these from quartz (and other silica materials) and silicate gangue minerals." Phosphate ores are within this category. The phosphates found in the Florida deposits are phosphates of lime which are non-metalliferous minerals and the gangue is chiefly quartz in the form of sand or a silicate. Christensen discloses that his process is carried out by crushing the ore to free the different minerals which are then ground to the desired fineness. It must be borne in mind that with the Florida phosphates there is no need of grinding, the quartz being already reduced to sand in the natural state. Under Christensen's teaching the ore is then mingled with water to form a pulp which next is mixed with a suitable oil or oily compound in such a manner as to divide the ore into a large number of relatively very small particles and to distribute these throughout the pulp. This results in selective oiling and selective oil flocculation of the minerals to be concentrated. In short, a method of preferential oiling between the siliceous and non-siliceous parts of an ore is shown. Christensen goes on to state: "Preferably at the same time that the oil is thus being distributed through the pulp a large number of small air bubbles, or bubbles of other inert gas, are injected into the pulp and thoroughly mixed therewith. * * * The result of the admixture of the fine air bubbles with the pulp is that some of these become incorporated in and attached to the oil-mineral floccules and levitate these and render them buoyant, forming an oil-mineral bubble floccule. After the formation of the oil-mineral-bubble floccule, the pulp is allowed to become sufficiently quiescent so that the oil-mineral-bubble floccules rise to the surface of the pulp. The mass of buoyant oil-mineral-bubble floccules thus formed at the surface of the pulp is then removed, leaving the particles of quartz and silicate gangue minerals in the pulp."

Christensen makes reference to phosphates. Having previously divided minerals into categories based upon their oil-flocculation characteristics or lack of them, he states, "The oil-flocculating effect and oil-floccule levitation effect vary considerably with different minerals of Class II. In general the carbonates, sulphates, phosphates * * * (i. e. chemical salts) oil-flocculate more readily than the oxides or hydroxides * * *". The court below concluded that Christensen was not making reference to mineral phosphates but to phosphates of the base metals. It is true that Christensen does make reference in his patent to the ores of base metals and to lead and copper minerals, but I can perceive no adequate basis for the conclusion of the learned trial judge to which I have referred. Certainly there is nothing in the language of Christensen's patent which would so limit the purposes for which he intended it.

Upon examination many of the other distinctions made by the court below between the processes of Chapman and Littleford and those of Christensen disappear. Some of these distinctions are based upon the creation of loosely bonded agglomerates under Chapman and Littleford, which are alleged to be non-existent in the concentration processes of Christensen. Christensen develops what are designated as "buoyant oil-mineral-bubble floccules." The distinction between these two products, though emphasized by the appellee, seems to me to be without real difference. Christensen in his preferred process makes use of much more oil than do Chapman and Littleford, from ten to fifteen times as much, yet Christensen's claims make no reference to any particular amount of oil required to be used to accomplish the result sought by him. The claims of his patent simply require the use of sufficient oil to effect flocculation. Christensen states that in oiling the minerals 'a fatty acid or a fixed oil may be made use of. In his specification, however, he states, "The mineral oils alone (i. e. without admixture with other oils or resins) are useless in my process as they do not selectively oil-flocculate

the ore-minerals." Chapman and Littleford make use of fuel oil and oleic acid. Christensen's pulp is more dilute than that of Chapman and Littleford. Christensen points out that when the ore is ground it must not be done with iron instruments since these leave coatings of iron on the particles of ore which tend. to make the pulp subject to electrolysis. Chapman and Littleford, however, have no need of any grinding process since their material is already finely ground by nature. The trial court found that in the Chapman and Littleford process alkali is used. It is true that the pulp of Chapman and Littleford is slightly alkaline after mixing. The extent of the·alkalinity in the pulp, however, before mixing is not as large. Christensen abhors the use of iron throughout the whole of his process. Chapman and Littleford make no reference to the metal of the receptacles in which their processes are to be conducted. Christensen states that the presence of soap in the pulp will retard or undo his processes. Chapman and Littleford state that the oleic acid used by them will form soap with the fuel oil, leaving the fuel oil as an oily material coating the phosphate particles. Chapman and Littleford use caustic soda with the fuel oil and oleic acid and I think that.there is no doubt that the combination of these ingredients will precipitate out a kind of soap which due to the action of the caustic will be alkaline by nature. Christensen abhors the presence of electrolytes " * * * which inhibit the selective formation of oil-mineral floccules containing non-siliceous minerals * * *". Chapman and Littleford express no such abhorrence.

It will be observed that there are many very substantial similarities and a few differences between Christensen and Chapman and Littleford. Those differences consist chiefly of the presence of alkali in the Chapman and Littleford process, whether by way of soap or otherwise and the existence of electrolytes in the pulp. None the less, Christensen does disclose a method for the preferential oiling of minerals including phosphates and the process is one of water gravity concentration and froth flotation. He makes no reference to the use of a shaking table or any similar device.

In United States Patent No. 1,795,100, issued to Trotter and Wilkinson upon March 3, 1931, upon an application filed January 24, 1928, a method for the recov-

ery of bone phosphate lime from the Florida deposits by means of a froth flotation process is disclosed. The crude phosphatic material is treated by agitating it " * * * in a pulp with a suitable soap and with an oily material which may be unsaponifiable or non-frothing, such as fuel oil." The patentees refer to the creation of a "soap solution" created by combining oleic acid with caustic soda and water. The specification of the patent goes on to state: "The thick pulp with the soap and oil was agitated forty-five seconds and then water was added to fill the machine almost to overflowing and vigorous agitation started and air admitted. The float soon rose and overflowed, with some assistance from a paddle for one minute and forty-five seconds. The concentrate as it lay on the collecting launder was composed of clean grains not unlike wet yellow sand." The similarity of this process to the first step of the Chapman and Littleford patent is impressive, and it should be noted that the thick pulp of Trotter and Wilkinson contains soap, is alkaline and is subject to electrolysis. Trotter and Wilkinson however make no reference to the use of a shaking table or any similar device.

In United States Patent No. 1,547,732, assigned by Broadbridge and Edser and issued to Minerals Separation North American Corporation upon July 28, 1925, a method for the recovery of high grade phosphates from crude phosphatic material is disclosed by means of froth flotation and preferential treatment of the phosphatic material. The Broadbridge and Edser disclosure consists of agitation of the material with oleic acid, the preferred frothing agent, soap, or other frothing agents, and air. This process is designed to coat the phosphate particles in such wise as to make them amenable to separation from gangue " * * * such as quartz, silicates, or calcium carbonate". The froth obtained by the process is drained from the apparatus, carrying the phosphatic particles with it, and after the removal of the water from the froth the phosphatic concentrate is available. Though no oil is used in the process the pre-treatment of the material prior to agitation is substantially similar to oiling. Broadbridge and Edser make no reference to the use of a shaking table or any similar device.

Attention must now be directed to an earlier Littleford Patent No. 1,780,022, issued upon October 28, 1930 upon an appli-

798

cation filed July 3, 1928, for flotation concentration of phosphatic materials. This is the patent referred to by the District Judge in the quotation set forth in the second paragraph of this opinion. Its validity is not in issue in the case at bar as is stated by the learned District Judge, but the essential agents, except for the shaking table, set forth in this Littleford patent are those specified in the patent sub judice; the identical materials are there treated substantially as disclosed by the patent at bar. It is true that the earlier Littleford patent makes no disclosure as to the loosely bonded agglomerates referred to in the Chapman and Littleford patent, but it is obvious that if loosely bonded agglomerates are created under the patent at bar, they are also created in the earlier Littleford patent since the operation of its process is precisely similar to that of the first step disclosed in the patent sub judice. The record discloses an admission to such effect by Professor Gaudin. In fact the only substantial difference which may be suggested between Littleford and the first step of Chapman and Littleford is in the size, the so-called "mesh", of the phosphate particles to be concentrated.

It is obvious therefore that Chapman and Littleford, although including as a step in the process disclosed by them the process described and claimed by Littleford, did not claim this process as their invention. It follows therefore that if the Chapman and Littleford disclosures are to be sustained as invention it must be upon the basis of the process disclosed by Littleford used in conjunction with the shaking table as shown by the patent sub judice.

Under all the circumstances I am unable to perceive why Chapman and Littleford's preferential oiling process alleged to create loosely bonded agglomerates of phosphate and oil with air entrained as the flexible coupling to join the particles should have occasioned surprise to some of the experts testifying at the trial. What Chapman and Littleford make use of is a froth flotation process, just as the Littleford patent discloses a froth flotation process and just as Christensen and Broadbridge and Edser disclose froth flotation processes. There is no convincing evidence that Chapman and Littleford by their use of oil and air created any result which was different substantially from that known to the prior art. Though the actual operation of the Chapman and Littleford

process differs in detail from those theretofore employed, none the less the principle of the preferential oiling of phosphate materials disclosed by Chapman and Littleford is substantially that of the prior art.

I think that the trial court fell into error upon this phase of the case because of the emphasis placed by the patent and the appellee's witnesses upon the phrase "loosely bonded agglomerates". I think that it appears that the loosely bonded agglomerates which the patent describes are nothing more than particles of phosphate occluded from the gangue, agglomerated by oil and air and given a different falling rate as in the processes of the prior art.

Had Chapman and Littleford discovered a method for the preferential oiling of phosphate particles in the presence of silica comprising the creation and use of the loosely bonded agglomerates to which their patent refers I would favor sustaining the patent. I think that this is not the case, however.

From the foregoing it will be apparent that I am unable to reach any other conclusion than that the preferential oiling of phosphate particles to separate them from their surrounding gangue of silica was known to the art prior to the disclosures of the patent sub judice and I must therefore conclude that Chapman and Littleford may not urge that they exercised inventive genius in so far as the first step of their process is concerned.

In the second step of their process, as their patent discloses, Chapman and Littleford throw the loosely bonded agglomerates of phosphates and phosphate-bearing material upon a shaking table where the phosphates are drawn off at the side of the table. This method of separation need not be followed since the separation processes may progress by skin or film flotation, the phosphate particles riding upon the surface of the water and moving with the current while the wet sand sinks. In the preferred process of Chapman and Littleford, however, a shaking table of the "general type" used in effecting the concentration of metalliferous minerals is made use of. This use requires a brief discussion of the shaking table in relation to the prior art.

The shaking table in its operation utilizes the differences in falling rates of minerals in water. In other words, a solution or pulp containing mineral particles is placed upon the table which thereupon is

shaken forward and back. During the forward stroke of the table the particles of heavier metal resting on the table adhere to its surface. As the table is thrown backward the inertia of the resting particles causes them to hop forward until their course is halted again by the friction attendant upon their contact with the surface of the table. Since the backward movement of the table is slower than its forward stroke the mineral particles resting upon the surface of the table remain in position during the backward stroke. The final result is that the mineral particles come off at the end of the table. The gangue goes to the side. A constant cross-current of water playing across the table accelerates the separation processes. The shaking table process of Chapman and Littleford reverses the customary procedure in respect to the destinations of the phosphates and the gangue. In their process the particles of phosphate come off at the side of the table and gather in the concentrates launder while the gangue moves to the end of the table.

An examination of the prior art discloses that in 1886 United States Patent No. 348,157 was issued to Carrie J. Everson for a process for concentrating ores. Everson's first step was to treat the pulverized ore with a fat or oil together with an acid or a soluble neutral or acid salt to effect a union of the free metal with the mixed material. The ore was rendered lighter than the gangue particles by the addition of the oil. Both the mineral agglomerates and the gangue were heavier than the water. Everson's second step consisted of treating the whole mass to the action of a shaking table or a similar device. The result was the separation of the mineral from the gangue.

In the Cattermole Patent No. 763,260, of June, 1904, the principle of the shaking table was again made use of to effect the separation of the metalliferous constituents of metalliferous ores from gangue. They were first conditioned by adding soap and large quantities of oil to the pulp which was agitated thereafter so that the mineral particles might flocculate and form granules. Cattermole states:

" * * * if the mixture of water, oil, metalliferous particles and gangue be thoroughly agitated, the metalliferous particles which have become coated with oil will adhere together and form granules, which granules, partly by reason of gravity or partly on account of their bulk as compared with the individual grains of gangue, will offer ready means for separation in an up-current separator, a jig, or other similar appliance. * * *

"As the granules remain specifically heavier than the gangue or can by suitably adjusting the amount of oil and the agitation be obtained of a size larger than that of the gangue particles, the granules, with a certain amount of heavy sands sink to the bottom and are discharged * * * while the lighter sands are carried away by the upward current and discharged."

It should be observed that the granules created by the Cattermole process are formed by oil and mineral particles without attendant bubbles of air. They therefore move to the bottom of the separating device while the gangue moves upward.

In the British patent to Cattermole, No. 17,109, of 1903, the patentee discloses a process which has for its object " * * * the separation of minerals from the siliceous or earthy matters of ores by means of soaps or similar compounds * * * ". Cattermole discloses a separation method in which the mineral particles "attached to, or more or less coated or enclosed by, films of fatty- or resin-acids, and the like, are capable of being separated from the gangue or earthy particles by various methods dependent on this altered physical condition." He goes on to say, "Thus they may be caused to adhere to each other by suitable agitation of the whole mass, and the resulting mineral aggregates may be separated therefrom by gravity, by sizing, by up-currents, or by other suitable known ore-concentration methods."

I think that it is apparent that the use of conditioning agents by Everson and Cattermole is for no other purpose than to modify the falling rate of the mineral particles in water to the end that they may be stratified by gravity concentration apparatus.

In the Minerals Separation Patent, No. 835,120, of 1906, to Sulman, Kirkpatrick-Picard and Ballot, a process is disclosed for concentration of ore by froth flotation. The pulp is mixed with a comparatively small quantity of oil and is then agitated. Air is entrained and froth is created, there being thus formed oil-mineral-bubble agglomerates not unlike those formed in the process sub judice. Moreover, for the sep-

aration of the larger particles from the gangue, the patent suggests the use of the shaking table to complete the process of separation.

Attention is directed also to the Mineral Separation Sulman Patent No. 835,143, of 1906, and Minerals Separation Patent No. 879,985, of 1908. The latter patent discloses a skin flotation process, but the oiled particles are brought into contact with air prior to their submission to water. The patentees also disclose the use of the shaking table as a means to separate the mineral particles from the pulp.

In Christensen's United States Patent No. 1,467,354, of 1923, issued upon an application filed in 1918, the patentee discloses that mineral particles, preferentially oiled to the end that their falling rate in water may be modified, may be separated by the action of a shaking table. See also Borcherdt's United States Patent No. 1,585,755 issued in 1926 upon an application filed upon September 15, 1922.

None of the patents to which I have referred deal with or disclose the use of a shaking table for the separation of phosphate particles from their attendant gangue or in fact deal with the concentration of phosphates at all. None the less it clearly appears that the shaking table was available in the art for wet gravity concentration of numerous oiled pulps and that it was well understood that the shaking table would serve to concentrate mineral particles whose falling rates in water had been modified by preferential oiling to differentiate their falling rates from those of the attendant gangue particles. These disclosures are of the very essence of mineral concentration by means of the shaking table.

In view of this state of the art, in my opinion Chapman and Littleford in throwing their preferentially oiled phosphates and the gangue upon the shaking table simply made use of one of the well known tools of the art and their patent while disclosing a method for the concentration of phosphates which is an improvement over the methods previously shown indicates no more than the exercise of mechanical skill and ingenuity by the patentees. This use of the shaking table by Chapman and Littleford was no more than the application of a tool well known to the prior art. See Pennsylvania R. Co. v. Locomotive, etc., Co., 110 U.S. 490, 496, 4 S.Ct. 220, 28 L.

Ed. 222, and Paramount Publix Corporation v. American Tri-Ergon Corporation, 294 U.S. 464, 473, 55 S.Ct. 449, 79 L.Ed. 997, and Lovell Mfg. Co. v. Cary, 147 U.S. 623, 634, 13 S.Ct. 472, 476, 37 L.Ed. 307. In the last cited case it was stated: "* * * the public cannot be deprived of an old process because some one has discovered that it is capable of producing a better result or has a wider range of use than was before known." This court has so held a number of times. Motion Picture Patents Co. v. Calehuff Supply Co., Inc., 3 Cir., 251 F. 598, 602; Guardian Trust Co. et al., v. Downingtown Mfg. Co., 3 Cir., 29 F.2d 887, 889, 890; United States Hoffman Machinery Corp. v. Pantex Pressing Machine, Inc., 3 Cir., 44 F.2d 685, 688; Atlantic Refining Co. v. James B. Berry Sons' Co., 14 F.Supp. 891, 894, D.C.,W.D.,Pa.

The learned District Judge in the course of his opinion states: "Chapman and Littleford knew that the difference in the specific gravity of phosphate and of the gangue was so slight that no separation could be based on it. Before they fed the oiled phosphate pulp to a shaking table they did not know what would happen. The phosphate being slightly heavier than the gangue, there was no certainty about the operation. To their surprise the slightly heavier phosphate particles in the form of loosely-bonded agglomerates stratified above the gangue and were washed across the table and the gangue was guided by the riffles to the end of the table. Before the experiment was tried it was impossible for any one in the light of the knowledge of the art to say it would be successful."

This statement seems to me to embrace what I deem to be the substantial error of the court below upon this phase of the case. The shaking table when used by Chapman and Littleford in the experiment referred to performed its functions in the manner in which it had performed them in the past and as it must always perform them in the future. The phosphate particles concentrated above the gangue in accordance with physical law well known to those skilled in the art of minerals separation. Surprise should have been occasioned had the table performed its function with any different result.

I must respectfully dissent from the majority of the court. First, in my opinion, the method for preferential oiling of the phosphate particles disclosed by Chapman

and Littleford is substantially in accordance with methods known to the prior art. Second, the use of the shaking table to concentrate oiled phosphates as shown by the patentees discloses the application of a tool of the art widely used theretofore in the concentration of other preferentially oiled minerals. The use indicated by Chapman and Littleford is too closely analogous to that known to the art to sustain invention.

I would hold the patent invalid and dismiss the bill of complaint.